BROADWELL REALTY CORPORATION v. J. HOWARD COBLE, SECRETARY OF REVENUE FOR THE STATE OF NORTH CAROLINA

No. 7610SC44

(Filed 4 August 1976)

Taxation § 26— franchise tax — installment sales — deferred profits — deduction for deferred income tax

A corporation using the installment method of accounting was entitled to have deferred income tax on installment sales deducted from deferred gross profit from installment sales in determining additions to "surplus" for the purpose of computing the corporation's franchise tax.

APPEAL by defendant from *Bailey, Judge*. Judgment entered 28 October 1975 in Superior Court, WAKE County. Heard in the Court of Appeals 5 May 1976.

Plaintiff filed its franchise tax return in time based upon its closing balance sheet for its fiscal year ended 31 October 1964 and paid the tax shown to be due. Defendant audited the return and assessed an additional tax in the amount of $213.98. Plaintiff paid this assessment on 24 March 1966 together with interest in the amount of $9.63 and brought this action under the provisions of G.S. 105-266.1 to recover the sum of $199.87, the amount plaintiff alleges was erroneously assessed, with interest thereon from the date of payment.

The parties are not in dispute with respect to the figures involved nor with respect to the chronology of events.

Plaintiff is in the business of constructing and selling residential dwellings. In so doing it was its custom to sell a house upon a down payment of an average of 4.8% of the contract sales price, the assumption by the purchaser of the outstanding first lien deed of trust, and the payment of the balance over a period of years (usually 20 to 30 years) with these deferred payments secured by a second lien deed of trust. The average first lien deed of trust secured a note for approximately 75% of the contract sales price, and plaintiff continued to be liable for the payment of the amount secured.

For income tax purposes, plaintiff reported income from these transactions under the installment method; i.e., profits on the sales were reported as taxable income in the year in which payments were received, and income tax on the transaction was paid only in the year in which payments were received.

On its books and records for the year in question, plaintiff showed deferred sales in the amount of $142,650.87. This amount represented the total gross profit on the installment contracts which plaintiff would collect in subsequent years. Plaintiff did not, however, include the $142,650.87 in its taxable base on the franchise tax return and, therefore, it was not included in the computation of plaintiff's franchise tax liability.

Upon audit of the return, defendant, by notice dated 17 January 1966, proposed an assessment of additional tax based on his determination that the plaintiff's taxable base should be increased by the total amount of the deferred sales. The determination was arrived at by defendant's including the amount of $142,650.87 in plaintiff's surplus.

Plaintiff sought a partial refund on the basis that the amount of deferred sales included in surplus by defendant should have been reduced by $72,923.12, the amount of federal and state income taxes which p'aintiff would be required to pay as payments were received on the deferred sales contracts. The claim for refund was denied and plaintiff brought this action to recover the tax it alleges was erroneously assessed.

The matter was heard by the court without a jury and judgment was entered for plaintiff. Defendant appealed.

*Attorney General Edmisten, by Assistant Attorney General George W. Boylan, for J. Howard Coble, Secretary of Revenue for the State of North Carolina, appellant.*

*Biggs, Meadows, Batts & Winberry, by Frank P. Meadows, Jr., for plaintiff appellee.*

MORRIS, Judge.

G.S. 105-122(b) provides that "[e]very such corporation taxed under this section shall *determine the total amount of its issued and outstanding capital stock, surplus and undivided profits;* no reservation or allocation from surplus or undivided profits shall be allowed other than for definite and accrued legal liabilities, except as herein provided; *taxes accrued,* dividends declared and reserves for depreciation of tangible assets as permitted for income tax purposes shall be treated as deductible liabilities." (Emphasis supplied.)

Defendant contends that since the income tax liability on the deferred sales is not a "definite and accrued legal liability,"

it can only be deducted if it comes within the exceptions noted and that it cannot qualify as "taxes accrued." We agree that the item is not technically "taxes accrued" as the term is generally understood. However, we do not think that is decisive of this case.

Under G.S. 105-122, the franchise tax return shall be based on facts and information " . . . as shown by the books and records of the corporation at the close of such income year."

G.S. 55-49 defines in section (a) thereof, surplus as " . . . the excess of a corporation's net assets, as defined in this Chapter, over its stated capital. Such surplus consists of earned surplus or capital surplus or both, and shall be so classified on the books."

Other sections of G.S. 55-49 pertinent here are as follows:

"(b) Except where provisions of this Chapter specifically require a different standard or impose additional limitations, the assets of a corporation may, for the purpose of determining the lawfulness of dividends or of distributions or withdrawals of corporate assets to or for the shareholders, be carried on the books in accordance with generally accepted principles of sound accounting practice applicable to the kind of business conducted by the corporation."

"(d) Earned surplus is the portion of the surplus of a corporation equal to the balance of its net profits, income, gains and losses, including gains and losses realized from the disposition or destruction of fixed assets (but not including unrealized appreciation in the value of any assets), from the date of incorporation, after deducting subsequent distributions to shareholders and transfers to stated capital and to capital surplus to the extent that such distributions and transfers are made out of earned surplus, and after adding all transfers made from capital surplus as permitted by subsection (i) of this section, all computed in accordance with generally accepted principles of sound accounting practice applicable to the kind of business conducted by the corporation.

(e) Capital surplus is the entire surplus of the corporation other than its earned surplus, and includes, without being limited to, paid-in surplus, surplus arising from reduction

of stated capital and surplus arising from a revaluation of assets made in good faith upon demonstrably adequate bases of revaluation. Capital surplus may be classified on a corporation's books and statements according to its derivation."

"(g) In computing earned surplus or net profits, deduction shall be made for such obsolescence, depletion, depreciation, losses, bad debts and other items as accords with generally accepted principles of sound accounting practice."

It is clear, we think, that the purpose of G.S. 105-122 is to *levy* a tax upon going corporations for the privilege of doing business in this State.

" 'In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the Government, and in favor of the citizen.' " *Pipeline Co. v. Clayton, Comr. of Revenue,* 275 N.C. 215, 226-227, 166 S.E. 2d 671 (1969), quoting *Gould v. Gould,* 245 U.S. 151, 153, 62 L.Ed. 211, 38 S.Ct. 53 (1917).

In the Business Corporation Act, and particularly G.S. 55-49, the General Assembly specifically decreed that the books and records of a corporation must be kept in accordance with "generally accepted principles of sound accounting practice." The statute levying a franchise tax requires that the tax be computed on a base the information for which is obtained from the books and records of the corporation. Since the books and records must be kept using "generally accepted principles of sound accounting practice," it seems, *a fortiori,* that the base upon which the franchise tax is computed must be arrived at in the same fashion.

We then determine what treatment generally accepted principles of sound accounting practice require with respect to deferred income tax on installment sales in arriving at "surplus and undivided profits" as the base for computing franchise tax. First, the franchise statute does not define surplus. The Corporation Act does, however, define surplus as "the excess of the corporation's net assets (as defined in Chapter 55) over its

Realty Corp. v. Coble, Sec. of Revenue

stated capital." G.S. 55-49 (a). Net assets are defined as " . . . the amount of a corporation's assets in excess of its liabilities." G.S. 55-2(8). Liabilities, by G.S. 55-2(7), include debts and claims determined in accordance with generally accepted principles of sound accounting practice.

Although the term "undivided profits" is not now generally used in the accounting world, except by banks, it was currently in use in 1927, when the phrase first appeared in the franchise tax statute. See 1927 PL, C 80 § 210. In *Edwards v. Douglas*, 269 U.S. 204, 215, 70 L.Ed. 235, 241, 46 S.Ct. 85 (1925), the phrase undivided profits was defined to mean those profits which had "neither been distributed as dividends nor carried to surplus account upon the closing of the books; that is, current undistributed earnings."

It would appear then that the phrase "surplus and undivided profits" used in the statute levying a franchise tax (G.S. 105-122) has the same meaning as "surplus" as defined in the Business Corporation Act (G.S. Chapter 55).

Expert accountancy testimony was presented on behalf of plaintiff and was uncontradicted. The expert testimony was to the effect that there is no circumstance under generally accepted accounting principles whereby the $142,650.87 would be included in surplus without first a reduction for the taxes. In other words, the total amount of $142,650.87 would never reach the surplus item on the balance sheet. The deferred tax expense should be shown in the liability section of the balance sheet and not included in the stockholder's equity section. If included in the stockholder's equity section, it is considered inaccurate and misleading. There can be no real doubt with respect to the correctness of the accounting principles as testified to by plaintiff's expert witness in terms of generally accepted principles of sound accounting as applied to the method of reaching a franchise tax base contended for by plaintiff. Securities and Exchange Commission Regulation 210.3-16, subparagraph 0 (1975); Securities and Exchange Commission Regulation 210.5-02 (adopted in Release No. AS-149 effective for financial statements filed after 28 December 1973); Securities and Exchange Commission, Accounting Series Release No. 85 (Feb. 1960) (17 CFR Part 211); Accounting Principles Board Opinion No. 11, sec. 59 (Dec. 1967).

A case very much in point is *American Can Co. v. Director of the Div. of Tax.*, 87 N.J. Super. 1, 207 A. 2d 699 (1965). There the appeal involved the sum of $4,215.57 additional franchise tax liability which resulted from the Director of the Division of Taxation's action in adding to the taxpayer's reported net worth a $20,300,001 "reserve for deferred income taxes" which was shown on the taxpayer's books as a liability. The Director took the position, as does the Secretary here, that the reserve for deferred taxes was a surplus reserve and includible in net worth for franchise taxes. The Director argued, as does the Secretary here, that the amount of the deferred taxes was conjectural, depending upon future tax rates and future net profits, and that in the meantime the taxpayer had unrestricted use of the funds represented by the item of deferred income tax. The New Jersey Court noted that the statute required that the taxpayer's books be maintained in accordance with sound accounting principles and that the Director make a determination of net worth, for purposes of franchise tax, in accordance with sound accounting principles.

In holding that the Director was in error the Court said at pages 704-705:

"By contrast, there is no dissent in the present case that proper accounting practice, in setting up a reserve for deferred taxes because of general purpose accounting on a straight-line depreciation basis contemporaneous with computation of income taxes by use of accelerated depreciation, requires the fixing of the *amount* of the reserve at the tax dollar (income tax) saving produced by applying the current income tax rate against the gross difference in depreciation reflected by the respective different depreciation rate schedules. What the Director contends for here in his right to eliminate the *entire* deferred tax reserve from the liability side of the corporate balance sheet and to incorporate it into surplus, thereby enlarging net worth. That this is proscribed by generally accepted accounting principles, and was, as of December 31, 1958, is indubitable from the record of this case."

"But the State fails to present a tangible rational reason why we should not here, as we recognized as necessary in Macy, impose the limitation plainly written into the statute that any redetermination of net worth by the Director must

of itself pass muster as comporting with sound accounting principles in the sense that the accounting profession would understand that term. In the name of interpretation 'for purposes of the act' we are here asked, in effect, to ignore a plain, unambiguous and express proviso of the statute. And this for no other reason than that the Director regards a deferred tax reserve, which sound accounting practice requires to be reflected in the balance sheet lest a corporation present a misleading picture of its financial posture, as merely contingent.

As to the contingency of the reserve, or the degree thereof, the Director may or may not be theoretically correct were we permitted to examine that concept *a priori* and free from the restrictions of the statute. But in terms of whether any such contingency permitted the Director's relegation of the reserve to surplus, so as to incorporate it into the taxable net worth base, it is entirely logical to deduce from the statutory language that the Legislature preferred to make the matter depend on the objective criterion of the consistency of such action with sound accounting principles rather than to inject it into the area of technical litigation over contingency. Presumably there might be little or no element of contingency in such a reserve in the case of some taxpayers. Exploration of all the relevant facts (which did not take place at the hearing in the present matter) might frequently require hearings of a length and complexity which it may well be inferred the Legislature intended to avoid when it devised what it considered to be a 'relatively simple and administratively feasible formula for measuring the value of the exercise of the corporate privilege in this State.' See Macy, *supra* (77 N.J. Super., at p. 167, 185 A. 2d at p. 689). Moreover, in the light of the statute, once it were determined that placing the instant reserve in surplus would offend the relevant settled sound accounting principle it would be quite inappropriate for the court to entertain any debate as to the merits (in an accounting sense) of the particular accounting principle implicated."

The New Jersey Court also noted that there are cases holding to the contrary but pointed out the differences in statutory language.

In the case before us, there was no expert accounting testimony on behalf of the Secretary contradictory of plaintiff's

testimony with respect to the correct accounting principles applicable here. The witness for the defendant merely testified that he had been employed by the Corporate Tax Division of the North Carolina Department of Revenue since 1958 and that, to his knowledge, "the deferred taxes that have been claimed by the plaintiff as taxes accrued have never been allowed by the Secretary of Revenue as a deduction or exclusion from the capital stock surplus and undivided profits franchise tax base." As we pointed out earlier, whether the item of deferred taxes qualifies as "accrued taxes" within the exception in the statute is not, we think, determinative of this appeal.

Among the facts found by the court were these:

"16. The statutory franchise tax base of a corporation, measured by 'the total amount of its issued and outstanding capital stock,. surplus and undivided profits,' is found in G.S. 105-122(b). The terms used in the tax base are not defined in the statute.

17. The issued and outstanding stock of the plaintiff was reflected on its books and records at $3,000.00 and is undisputed as being an accurate reflection of the plaintiff's issued and outstanding capital stock.

18. The statutory term 'surplus and undivided profits' is not used together in current commercial accounting terminology. The phrase first appeared in the Franchise Tax Act in 1927 (1927 PL, Chapter 80, Sec 210). At that time, 'surplus' was used to mean the excess of the aggregate value of all the assets of a corporation over the sum of all of its liabilities including capital stock. Current accounting terminology does not treat capital stock within the category of liabilities but includes it in a corporation's 'net assets,' 'net worth' or 'stockholders' equity' section of the balance sheet; i.e., total assets less total liabilities. In 1927 the term 'undivided profits' was used in accounting terminology to mean profits which have neither been distributed as dividends nor carried to a surplus account upon the closing of the books. 'Undivided profits' is found to mean the current portion of the surplus account. 'Surplus and undivided profits,' when taken together, in the context of their normal commercial usage in 1927, has the same meaning as 'surplus' in current commercial accounting terminology; i.e., that portion of the stockholders' equity or net

worth in excess of the amount of issued and outstanding capital shares, all as determined in accordance with generally accepted principles of sound accounting practice.

19. Periodic additions to the surplus and undivided profits of a corporation arise from the periodic determination of the net financial accounting income of the corporation after the deduction of the income tax expenses for the period.

20. The matching of revenue and expenses in the determination of net financial accounting income is a generally accepted principle of sound accounting practice. (It is found from the evidence that such sound accounting practices require that when the surplus and undivided profits of a corporation are increased by the inclusion in the pretax financial accounting income of the anticipated future income to be realized upon the collection of installment sales contracts, a reduction in such pretax financial accounting income is required for the income tax expense to be incurred in the future accounting period in which the profit on the installment sales becomes part of taxable income.)

21. Generally accepted accounting practices require that the measurement of the tax effect of the inclusion in revenue of the profit on installment sales should be made by calculating the differential between income taxes computed with and without inclusion of the profit on installment sales which create the difference between taxable income and pretax financial accounting income. The resulting income tax expense for the period includes the tax effects of all transactions entering into the determination of net financial accounting income for the period. The resulting deferred tax amount reflects the tax effects which will reverse in future periods. The deferred tax is not properly reported as a part of stockholders' equity or net worth but in the liability section of the balance sheet. The measurement of income tax expense is, by such treatment, a consistent and integral part of the process of matching revenue and expenses in the determination of net financial accounting income.

22. The taxable income of the plaintiff for the fiscal year ended October 31, 1964, exceeded $25,000.00. It is found from the evidence that it was reasonable to assume that

the taxable income of the plaintiff, without regard to taxable income arising from the collection of installment receivables, would in years subsequent to 1964 exceed $25,000.00. The North Carolina income was a level 6% rate, and the U.S. income tax on taxable income in excess of $25,000.00 was 48%.

23. The deferred North Carolina and U.S. income taxes on the $142,650.87 of gross profit on installment sales, added to the plaintiff's surplus and undivided profits by the defendant, amounted to $72,923.12 when measured in accordance with generally accepted accounting practices.

24. The increase as of October 31, 1964, in surplus and undivided profits of the plaintiff; determined in accordance with generally accepted principles of sound accounting practice, was $69,727.75.

· · ·

26. (It is found that the amount of the capital stock, surplus and undivided profits of a corporation reporting its installment sales on an accrual method for financial income accounting purposes will be the same regardless of whether it reports its taxable income on the accrual method or on the installment method.) The defendant at the trial admitted that a corporation reporting its taxable income on the accrual method would be allowed to measure its franchise tax base by the reduction of current financial accounting income by the entire income tax expense attributable to the revenue included in its financial income but that a corporation reporting its taxable income on the installment method would, under the interpretation of the defendant, be denied the reduction of such income by the portion of the income tax expense relating to the anticipated future profit on the installment sales.

27. The franchise tax base of the plaintiff determined upon the basis of its issued and outstanding capital stock, surplus and undivided profits amounted to $153,256.95 as of October 31, 1964."

Of these defendant excepted only to that portion of 20 and 26 in parentheses. Upon the findings of fact the court made the following pertinent conclusions:

"2. In construing and interpreting the language of the statute, the Court must be guided by the primary rule of

construction that the intent of the Legislature controls. Where the language of a statute is clear and unambiguous, judicial construction is not necessary. Its plain and definite meaning controls. But if the language is ambiguous and the meaning in doubt, judicial construction is required to ascertain the Legislative intent. PIPELINE CO. v. CLAYTON, COMR OF REV, 275 NC 215, 226 (1969).

3. In construing a statute, the Court's aim is to discover the connotation which the Legislature attached to the words or phrases and clauses employed, thus the words of a statute must be taken in the sense in which they were understood at the time when the statute was enacted, and the statute must be constructed as it was intended to be understood when it was passed. TELEPHONE CO v CLAYTON, COMR OF REV, 266 NC 687, 689 (1966).

4. Where the meaning of a tax statute is doubtful, it should be construed against the State and in favor of the taxpayer unless a contrary Legislative intent appears. PIPELINE CO v CLAYTON, COMR OF REV, *supra* at 226.

5. An administrative interpretation which requires all taxpayers electing the installment method of accounting to include the deferred gross profit from installment sales without regard for any possible or anticipated future Federal or State income tax liability may be considered by the Court, but it is not controlling. PIPELINE CO v CLAYTON, COMR OF REV, *supra* at 227.

6. Where there is a conflict between the interpretation of an administrative agency and that of the Court, the latter will prevail. CAMPBELL v CURRIE, COMR OF REV, 251 NC 329; PIPELINE CO. v. CLAYTON, COMR OF REV, *supra* at 227.

7. The annual additions to surplus and undivided profits represent the revenue and expense transactions included in the determination of pretax financial accounting income reduced by income tax expenses. Such tax expenses properly include the tax effects of revenue and expense transactions included in the determination of pretax financial accounting income. Taxes are to be recognized in the periods in which the differences between pretax accounting income and taxable income arise. To say that the gross income which is anticipated to be received in the future upon collec-

tion of installment contracts receivable should be added to surplus and undivided profits, with no deduction allowed for the income taxes to be paid at the time the gross profit is includable in taxable income, is to add to a corporation's surplus and undivided profits an amount which will never become a part of the corporation's surplus and undivided profits and is contrary to a proper interpretation of G.S. 105-122.

.　　.　　.

9. The plaintiff is entitled to judgment against the defendant in accordance with these findings and conclusions with interest as provided by law."

Suffice it to say that the facts found by the court are amply supported by the evidence and the conclusions of law are supported by the facts found.

Affirmed.

Judges PARKER and MARTIN concur.